UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LLOYD W. ADDISON                          CIVIL ACTION

VERSUS                                    NUMBER: 12-0977

STEVE RADER, WARDEN                       SECTION: "R"(5)

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(A), presently before the Court is the 28 U.S.C. §2254 application for federal habeas corpus relief of petitioner, Lloyd W. Addison, the State's response thereto, and Addison's traverse. (Rec. docs. 1, 14, 15). Having determined that an evidentiary hearing is not necessary, it is recommended, for the reasons that follow, that Addison's petition be dismissed with prejudice.

I.   FACTUAL AND PROCEDURAL BACKGROUND

Petitioner Addison is a state prisoner who is presently incarcerated at the Dixon Correctional Institute, Jackson, Louisiana. On June 8, 2006, a bill of information was issued

charging Addison with attempted second degree murder.[1]  On June 9, 2006, Addison entered a plea of "not guilty."[2]  The Louisiana Fifth Circuit Court of Appeal summarized the facts of the case as follows:

> On April 15, 2006, at approximately 8:00 p.m., Charlotte Rush and defendant, her boyfriend, checked into the Deep South Motel on Airline Highway in Metairie to spend time together away from their families and to use drugs.  During the night, they sat on the bed and smoked crack cocaine, talked, and watched television.  At one point, defendant jumped up and said, "You're doing someone under the mattress."  When Rush asked defendant what he was talking about, he explained that there was a trap door under the mattress.
>
> Rush got up and lifted the mattress, inadvertently hitting the wall, and defendant accused her of "giving him signals."  Rush told defendant he was "freaking out" and that he needed to calm down.  Defendant said, "Don't tell me to calm down ... what's his name?"  Rush could not think of a name so she made up a name, "Larry," which was the name of her son.  Defendant opened the door and stepped outside of the motel room, but Rush asked him to come back inside so they could talk about the situation.  When defendant came back inside, he hit Rush in the nose with what she thought was a bat that he had put in the corner of the room.
>
> After defendant struck Rush in the face, he grabbed her by the hair, threw her in the bathroom, and started punching her.  Defendant then left and closed the bathroom door.  Rush subsequently heard defendant outside the door, so she opened it and said, "Let's talk."  At that time, she noticed that defendant had knives in his hand.  Rush called defendant's name, but he went toward the door to the hotel room.  She did not want him to hurt anyone, so she told him to come back.  Defendant turned around, grabbed her, and started stabbing her.  He threw

---

[1]/St. Rec. Vol. 3 of 7, p. 29.

[2]/Id. at p. 5.

Rush back into the bathroom and closed the door, and Rush tried to hide underneath the sink.

Defendant came into the bathroom and started stabbing her again and beating her.  He dragged her out of the bathroom and told her to take off her shirt, saying "I know you're wired."  She took her shirt off and told him again he was "freaking out."  Defendant stabbed Rush in the head, neck, chest, hands, and leg.  He put a knife to her throat and said, "Tell him the gig's up, come in, come in."  Rush was scared, so she played along and said what defendant told her to say.  She then felt faint and fell to the ground.

Defendant started kicking Rush and said, "Get up b.tch, you're a dead b.tch ... I told you I'd kill you, you b.tch."  Afterwards, she looked around and did not see him, but saw that the door was open.  Rush ran out the door toward the motel office for help, but the office personnel told her to go away because they did not want any trouble.  Rush thought she heard defendant hollering for her, so she hid underneath a truck next to the office.  When she realized the "coast was clear," she ran to a house near the motel to see if she could find someone to help her.

Rush banged on the door, but the lady inside told her to go away because she did not want any trouble.  Rush asked her to call the police.  She then ran down the block and eventually knocked on the door of a house at 220 Carnation Street.  Matthew Grass, the owner of the house, came outside, and she told him that her boyfriend was trying to kill her and that she needed help.  Grass told her to calm down.  He took out his gun and said that no one was going to come on his porch and hurt her.

At approximately 3:10 a.m., the police received two 911 calls advising them that a topless, bloody white female was running around the area of Finch and Carnation Streets banging on doors.  Deputy Ruth Eddy of the Jefferson Parish Sheriff's Office (JPSO) arrived at 220 Carnation Street and observed Rush on the ground completely covered in blood with obvious stab wounds and screaming hysterically.  Rush was very afraid because she thought defendant was chasing her.  Rush told the officer that defendant was responsible for her injuries and that he could be located at the Deep South Motel, Room 12.  Deputy Eddy told other officers to go to that location to find the suspect.

Officers Michael Nicolini and John James and Sergeant James Wine went to the motel. The doorway to Room 12 had blood on the outside of it, and the door was slightly ajar. Deputy Eddy, Officer Nicolini, and Sergeant Wine saw a male subject, later identified as defendant, lying face down on the bed inside the room. The officers pushed the door open, went inside with their guns drawn, and told defendant to lie on the floor. Defendant initially hesitated, but then complied with the officers' command.

The officers observed a large amount of blood all over the walls and could tell that a struggle had taken place. The mattresses were flipped over, and there was clothing and belongings all over the place. Defendant was sweating and had blood all over his clothing. The officers searched the room and found a knife in the bathroom on the sink behind the faucet. They arrested defendant and advised him of his rights, and defendant waived them and gave a statement.

In his statement, defendant said that he and Rush had started drinking and smoking crack cocaine a few days before, and that they went to the motel to spend the night. He stated that a "black dude" showed up and that they smoked "dope" with him. Afterwards, the "black dude" left, and he and Rush lay in the bed. Defendant heard someone knocking on the wall, and he jumped up. Rush then pounded on the wall and told "them" to leave. She told defendant not to worry about it, and then she hit him, and they started fighting. Defendant claimed Rush had a knife in her hand and tried to cut him with it, and they fought over the knife. He explained that they were throwing each other all over the room, and that she may have been cut with the knife during the fight. Defendant said that Rush fell and dropped the knife and that he picked it up and threw it, and Rush ran out the door.

While the officers investigated the incident, Rush was taken to the emergency room at East Jefferson General Hospital where she was treated for her injuries. When Rush arrived, she was brought to the most critical resuscitation room where people are either in the process of dying or at risk of dying based on their injuries or illnesses. Rush had a wound a few inches long to the top of her head, a two inch wound to the left side of her neck, a three inch wound to her left chest, a two inch

4

wound to the right chest, a deep wound to her left hand between the thumb and index finger, three more wounds on that hand, a large wound to the lateral part of her right leg, bruising to the armpit area and chest, a broken nose, and a bruised and swollen nose and lips. Most of her wounds were penetrating wounds caused by a knife or sharp instrument. Rush had to have a blood transfusion during her hospital stay, which lasted a week and a half.

The morning after the incident, Rush's children went back to Room 12 at the motel and found another knife in a drawer. Approximately seven months later, Rush turned that knife over to Sergeant Al West along with a handwritten letter from defendant to Rush dated November 3, 2006. Rush maintained that the knife her children found was not the knife defendant used to stab her.

Also after the incident, Rush received several handwritten letters from defendant dated May of 2006. In those letters, defendant apologized and expressed remorse for what happened on the night of the incident. He indicated that the incident was a "drug event" that would never be repeated, and he admitted that she almost died because of his actions "on that drug." He asked her to get him out of jail, and he talked about the money she had received in a settlement. He noted that she would not have to testify against him if she married him.

Robert Foley, an expert forensic document examiner, compared the letters Rush received from defendant to defendant's handwriting sample and concluded that defendant wrote the letters to Rush.

Christine Kogos, an employee of the JPSO crime lab, conducted a preliminary test on the two knives found at the crime scene and the shorts and t-shirt defendant was wearing at the time of the incident. The preliminary test on the shorts and t-shirt and on the knife found by the officers at the crime scene (not the one found by Rush's children) was positive for blood.

Bonnie Dubourg, an expert forensic DNA analyst, conducted DNA tests on swabbings from the two knives found at the crime scene, the wall of Room 12, and defendant's shorts and t-shirt. The test results for the swabbings from the knife found by the officers at the crime scene, the wall of Room 12, and defendant's shorts and t-shirt were consistent with the reference buccal swab from Rush.

After the State rested its case, defendant presented

5

the jury with a different version of the incident.  He
contended that at 11:00 p.m. on the night in question, he
left the motel room and went to St. John Parish to buy
drugs.  When he returned at 1:00 a.m., he saw two black
males in their late teens or early twenties exiting Room
12 and getting into their vehicle.  Defendant exited his
vehicle and walked to the doorway of the room.  As he did
so, he noticed that Rush was crying and bleeding from the
nose.  He physically moved her into the room so they
would not draw any attention to themselves, since he had
illegal narcotics in his possession.

According to defendant, Rush was hysterical and
angry, and she had a knife in her right hand.  She
screamed at defendant to "go get those guys."  Defendant
took the knife from her and, when he did so, he saw that
her hands were injured.  Once he got the knife from her,
Rush tried to get it back.  When she did so, she ran her
hand onto the blade.  He threw the knife under the
dresser so she could not get to it.  During the struggle,
Rush was violently flailing herself around and against
the wall.  They rolled onto the bed and off the bed onto
the floor.

The struggle continued into the bathroom where Rush
badly injured her head on the exposed fittings under the
sink.  Defendant claimed that Rush was determined to get
out the door to find the two men who left.  He did not
know their identities or why she was after them.  At
approximately 1:30 a.m., Rush left the room fully
clothed, and he sat down on the bed thinking she would
return shortly.  He then washed off the knife and
afterwards, fell asleep.  The police officers later woke
him up and questioned him about the incident.  Defendant
gave a statement to the officers; however, he claimed at
trial that the first part of the statement regarding
smoking "dope" with a black man and hearing knocking on
the wall was not his statement, and that only the bottom
seven lines regarding the fight with the victim was his
statement.

Defendant testified at trial that he did not stab
Rush or break her nose or beat her.  He stated that he
did not intend to harm her, and he did not tell the
police or Rush (in the letters) that he had harmed her.
He testified that he did not cause her injuries.  When he
looked at the photographs of Rush in the hospital, he
claimed that she was not in that condition when she left

> the motel.  He said that, when Rush left the room, she
> had a serious cut on her head and several wounds to her
> hand.  He explained that, in his letters, he was only
> apologizing for having left her alone in the motel while
> he went to buy drugs and for accusing her of cheating on
> him.

<u>State v. Addison</u>, 8 So.3d 707, 710-14, No. 2008-KA-0461 (La. App. 5 Cir. 2/10/09); St. Rec. Vol. 1 of 7.

Addison's appointed counsel filed a motion to suppress confession, identification and physical evidence.[3]  On December 1, 2006, the trial court denied the motion to suppress the statement and the evidence.[4]  On September 11, 2007, jury trial commenced in the Twenty-Fourth Judicial District Court for the Parish of Jefferson, State of Louisiana.[5]  On September 13, 2007, the jury returned a responsive verdict of guilty on the charge of attempted manslaughter.[6]

On November 9, 2007, the trial court sentenced Addison to 20 years imprisonment with credit for time served.[7]  On June 27, 2008, Addison was found to be a second felony offender.  The trial court

---

[3]/<u>Id</u>. at pp. 40-41.

[4]/<u>Id</u>. at pp. 88, 125-26.  There was no identification to suppress.

[5]/<u>Id</u>. at p. 22.

[6]/<u>Id</u>. at pp. 25-26.

[7]/<u>Id</u>. at p. 81.  St. Rec. Vol. 4 of 7, pp. 466.

7

vacated Addison's original sentence and imposed a sentence of 40 years imprisonment with credit for time served. The court specified that Addison's sentence was to be served without benefit of probation or suspension of sentence.[8]

On direct appeal, Addison raised the following claims: (1) The trial court erred in admitting his statement because he was intoxicated and incapable of signing and understanding Miranda waiver. (2) The trial court abused its discretion in allowing the State to introduce cumulative and gruesome photographs of the victim. (3) Trial counsel was ineffective in failing to present a handwriting expert and in failing to object to the introduction of photographs of the motel room spattered in blood. (4) His right to an impartial jury was violated when jurors saw him in handcuffs and shackles. (5) The trial court failed to comply with state sentencing guidelines and imposed an excessive sentence. On February 10, 2009, the Louisiana Fifth Circuit Court of Appeal affirmed Addison's conviction.[9]   On February 25, 2009, the Louisiana Fifth Circuit affirmed Addison's sentence.[10]   Writs were

---

[8]/St. Rec. Vol. 5 of 7, pp. 5 and 14.

[9]/State v. Addison, 8 So.3d 707 (La. App. 5th Cir. 2009). St. Rec. Vol. 1 of 7, 5th Cir. Opinion, 2008-KA-0461, 2/10/09.

[10]/State v. Addison, 10 So.3d 236 (La. App. 5th Cir. 2009). St. Rec. Vol. 1 of 7, 5th Cir. Opinion, 2008-KA-0680, 2/25/09.

subsequently denied by the Louisiana Supreme Court on November 20, 2009.[11]

Addison's conviction became final 90 days later, on February 18, 2010, when he did not file a writ application with the United States Supreme Court.  Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. §2244(d)(1)(A), cert. denied, 529 U.S. 1099 (2000); U.S. Sup. Ct. Rule 13(1).

In January, 2010, Addison filed a motion to correct an illegal sentence.[12]  In his pleading, Addison argued that his sentence was illegal because it was based upon an invalid multiple bill; his sentence was illegal because it was based upon an invalid prior conviction; his sentence was excessive; and, his sentence was invalid because the trial judge failed to consider mitigating factors.  On January 28, 2010, the trial court held that regardless of the caption of his pleading, Addison sought post-conviction review and denied relief.[13]  Addison did not seek supervisory review.

---

[11]/State v. Addison, 25 So.3d 787 (La. 2009); St. Rec. Vol. 1 of 7, La. S. Ct. Order, 2009-K-0589, 11/20/09.

[12]/St. Rec. Vol. 1 of 7, tab 1.

[13]/Id. at tab 2.

On April 7, 2010, Addison filed a motion to correct an illegal multiple bill.[14]   Addison claimed that there was insufficient evidence to support his multiple offender adjudication and he was not advised of his right to remain silent.  On April 14, 2010, the district court denied Addison's motion, finding it repetitive and successive.[15]  On May 27, 2010, the Louisiana Fifth Circuit denied Addison's writ application, finding that the trial court was correct in finding Addison's application for post-conviction relief to be repetitive and successive.[16]  On June 24, 2011, the Louisiana Supreme Court likewise denied relief citing La.C.Cr.P. art. 930.3; State ex rel. Melinie v. State, 93-1380 (La. 1/12/96), 665 So.2d 1172.[17]

On March 25, 2011, Addison filed an application for post-conviction relief.[18]  Though not presented in exactly the same form, Addison raised the same claims he raised on direct appeal.  Addison again complained that his statement was inadmissible because he did not, as a result of his intoxication, voluntarily waive his Miranda

---

[14]/Id. at tab 3.

[15]/Id. at tab 4.

[16]/Id.  State v. Addison, 2010-KH-0375 (La. App. 5th Cir. 2010).

[17]/State ex rel. Addison v. State, 64 So.3d 211 (La. 2011).

[18]/St. Rec. Vol. 1 of 7, tab 5.

rights; his right to an impartial jury was violated when jurors saw him in handcuffs and shackles; gruesome photographs were improperly admitted; counsel was ineffective in failing to present a handwriting expert and failing to object to the introduction of photographs depicting the scene of the crime; the trial court, in imposing his sentence, failed to abide by state sentencing guidelines.  With the exception of his ineffectiveness claims which were denied on the merits, the district court, on April 5, 2011, found Addison's claims to be procedurally barred from review because they had been "fully litigated in an appeal."[19]   The Louisiana Fifth Circuit, finding "no error in the district court's April 5, 2011 Order," denied Addison's writ application.[20]  On April 9, 2012, the Louisiana Supreme Court likewise denied Addison relief.[21]

II.  <u>FEDERAL HABEAS PETITION</u>

---

[19]/St. Rec. Vol. 2 of 7, tab 6.   The court, in finding Addison's claims to be procedurally barred, properly quoted the language contained in La.C.Cr.P. art. 930.4(A) which provides, in pertinent part: "[A]ny claim for relief which was fully litigated in an appeal . . . shall not be considered."  The court, however, inadvertently cited La.C.Cr.P. art. 930.4(C), clearly inapplicable since it precludes from consideration claims which were "inexcusably" <u>not</u> raised on appeal.

[20]/St. Rec. Vol. 2 of 7.  <u>State v. Addison</u>, 2011-KH-0610 (La. App. 5th Cir. 2011).

[21]/<u>State ex rel. Addison v. State</u>, 85 So.3d 139 (2012).

On April 16, 2012, Addison filed the instant petition for writ of habeas corpus. Addison raises the same claims which he raised in his March 25, 2011 state post-conviction application. In fact, Addison's federal petition is <u>identical</u> to the post-conviction application filed with the state district court on March 25, 2011.

The State filed a response in opposition to Addison's petition conceding that the petition was timely filed and making no claim that Addison has failed to exhaust his state court remedies.[22] The State does, however, assert that, with the exception of his ineffective assistance of counsel claim, Addison's petition is procedurally barred.

III. <u>GENERAL STANDARDS OF REVIEW</u>

The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. §2254. The AEDPA went into effect on April 24, 1996[23] and applies to habeas petitions filed after that date. <u>Flanagan v. Johnson</u>, 154 F.3d 196, 198 (5th Cir.1998) (citing <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997)). The AEDPA therefore applies to Addison's petition, filed April 16, 2012.

---

[22]/Rec. Doc. No. 14, pp. 5-6.

[23]/The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. <u>United States v. Sherrod</u>, 964 F.2d 1501, 1505 (5th Cir.1992).

12

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim. Nobles v. Johnson, 127 F.3d 409, 419-20 (5th Cir.1997) (citing 28 U.S.C. §2254(b),(c)). The State concedes and the Court finds that Addison's habeas petition is timely. The State asserts that Addison's ineffective assistance of counsel claim is without merit and his remaining claims are procedurally barred.

IV. PROCEDURAL DEFAULT

As noted above, the state trial court found the majority of Addison's claims to be barred because they had been raised and adjudicated on appeal. This was the last reasoned state court decision on these issues.

A federal court generally will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the federal claim and adequate to support that judgment. This "independent and adequate state law" doctrine applies to both substantive and procedural grounds.

Under Louisiana law, Article 930.4(A) precludes post-conviction review of claims already "fully litigated" on

13

direct appeal.  <u>Bennett v. Whitley</u>, 41 F.3d 1581 (5th Cir.1994).
The presumption in the rule is that the claims were not new or
different from something previously litigated and resolved on
appeal.  <u>Id</u>. at 1583.  However, "the bar imposed by article
930.4(A) is not a procedural bar in the traditional sense, nor is
it a decision on the merits." <u>Id</u>.  For this reason, the bar does
not preclude habeas review of the claims at issue.  This Court
simply "look[s]-through" the ruling on collateral review and
considers only the direct appeal proceeding.  <u>Id</u>. at 1582-83.
Thus, the Court will proceed to address the merits of Addison's
claims.

V.  <u>STANDARDS OF MERITS REVIEW</u>

      28 U.S.C. §§2254(d)(1) and (2) contain revised standards of
review for questions of fact, questions of law and mixed questions
of fact and law in federal habeas corpus proceedings.  <u>Nobles</u>, 127
F.3d at 419-20 (citing 28 U.S.C. §2254(b) and (c)).

      Determinations of questions of fact by the state court are
"presumed to be correct ... and we will give deference to the state
court's decision unless it 'was based on an unreasonable
determination of the facts in light of the evidence presented in
the State court proceeding.'" <u>Hill v. Johnson</u>, 210 F.3d 481, 485
(5th Cir.2000) (quoting 28 U.S.C. §2254(d)(2)), <u>cert</u>. <u>denied</u>, 532
U.S. 1039 (2001).  The amended statute also codifies the

"presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.   28 U.S.C. §2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'"   <u>Penry v. Johnson</u>, 215 F.3d 504, 507 (5th Cir.2000) (quoting <u>Miller v. Johnson</u>, 200 F.3d 274, 280–81 (5th Cir.), <u>cert</u>. <u>denied</u>, 531 U.S. 849 (2000)), <u>aff'd in part, rev'd in part on other grounds</u>, 532 U.S. 782 (2001); <u>Hill</u>, 210 F.3d at 485.   The United States Supreme Court has clarified the Section 2254(d)(1) standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Williams v. Taylor</u>, 529 U.S. 362, 405–06, 412–13 (2000); <u>Penry</u>, 532 U.S. at 792–93; <u>Hill</u>, 210 F.3d at 485.   "'A federal habeas court

15

may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied [a Supreme Court case] incorrectly.'" <u>Price v. Vincent</u>, 538 U.S. 634, 641 (2003) (quoting <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002)) (brackets in original); <u>Bell v. Cone</u>, 535 U.S. 685, 699 (2002). Rather, under the "unreasonable application" standard, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." <u>Neal v. Puckett</u>, 286 F.3d 230, 246 (5th Cir.2002), <u>cert</u>. <u>denied</u>, <u>sub nom</u>, <u>Neal v. Epps</u>, 537 U.S. 1104 (2003). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. <u>Price</u>, 538 U.S. at 641 (quoting <u>Woodford</u>, 537 U.S. at 24-25); <u>Wright v. Quarterman</u>, 470 F.3d 581, 585 (5th Cir.2006).

VI.   <u>INADMISSIBILITY OF STATEMENT</u>

Addison argues that his statement was inadmissible because he was intoxicated and did not waive his <u>Miranda</u> rights before providing his statement. Addison raised the same argument on direct appeal. "By his first assignment of error, defendant argues that the trial court erred by not suppressing his statement. He contends that he was incapable of understanding and signing a '<u>Miranda</u> warning' because he was under the influence of drugs and alcohol." <u>Addison</u>, 8 So.3d at 714.

16

In <u>Martinez v. Quarterman</u>, 270 Fed. Appx. 277, 289-90 (5th Cir. 2008), petitioner argued that his statements were involuntary because he was intoxicated.  The Fifth Circuit, absent evidence of police coercion, rejected petitioner's argument, reasoning:

> In <u>Colorado v. Connelly</u>, the Supreme Court explained that "a defendant's mental condition, by itself and apart from its relation to official coercion" is not determinative of whether the statement is voluntary. 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).  The Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." <u>Id</u>. at 167, 107 S.Ct. 515; <u>accord</u> <u>Perry v. State</u>, 158 S.W.3d 438, 446 (Tex.Crim.App.2004) (explaining that "evidence of appellant's intoxication and injury does not raise any constitutional voluntariness issues because this evidence does not involve any police coercion or other official over-reaching").  Additionally, in <u>United States v. Garcia Abrego</u>, the defendant argued that the injections of valium he received while in the custody of Mexican officials, "coupled with the solicitousness of U.S. law enforcement officials, rendered his custodial statement involuntary." 141 F.3d 142, 170 (5th Cir.1998).  The district court found that the drugs had not impaired the defendant's mental capacity. <u>Id</u>. More importantly, this Court explained that the defendant had failed to demonstrate overreaching on the part of law enforcement, which "is a prerequisite to a determination that a confession is involuntary." <u>Id</u>

<u>Martinez</u>, 270 Fed. Appx. at 290.

In addressing the instant claim, the Louisiana Fifth Circuit reviewed the testimony submitted in connection with Addison's motion to suppress his statement.

At the suppression hearing, Sergeant James Wine and Deputy Michael Nicolini testified that they approached

17

Room 12 and saw that the door was ajar.  When they looked inside they saw defendant lying on the bed, sweating profusely and panting and looking nervous and confused. Defendant was conscious and breathing and did not appear to be sleeping.  He appeared to be "somewhat out of it," but not to the degree of semi-consciousness.

The officers entered the room and verbally advised defendant of his rights.  They also advised him of his rights using a standardized rights of arrestee form. Defendant read that form and signed it on the line below the sentence, "This statement of my rights has been read to me by the undersigned Officer."  However, defendant did not sign the form under the section stating that he was waiving his rights and agreeing to give a statement.

At the hearing, the officers explained that, although they neglected to have defendant sign under the "waiver of rights" section, it was a clerical error, and that defendant indicated to them verbally that he waived his rights and wanted to give a statement.  The officers asserted that they did not threaten or coerce defendant into giving a statement, nor did they promise him anything in return for one.  Sergeant Wine testified that the statement was taken in the parking lot of the hotel and that it was freely and voluntarily given.

Sergeant Wine and Deputy Nicolini testified that defendant admitted to them that he was under the influence of drugs or alcohol when he gave his statement. Defendant admitted to Sergeant Wine that he was smoking crack cocaine on the morning of the incident.  Sergeant Wine testified that defendant appeared to be under the influence of drugs or alcohol, and Deputy Nicolini testified that defendant "possibly" appeared to be under the influence of narcotics.  In his statement, defendant said that he and his girlfriend had started drinking and smoking crack "a few days ago," and that they had smoked crack with a black male before the incident.

Sergeant Wine and Deputy Nicolini testified that defendant was able to express clearly what happened that night and to adequately respond to their questioning, even though he may have been under the influence of drugs or alcohol at the time.  They stated that defendant was

able to provide personal information about himself such
as his name, address, and education level, and the name
of the victim.  Sergeant Wine added that defendant was
cognizant enough to give a statement that contradicted
the victim's version of events . . . .  Sergeant Wine
also added that defendant did not pass out, request
medical attention, nor require medical attention at the
time.[24]

Defendant did not call any witnesses at the hearing.

Following the testimony, defense counsel argued that
the statement should be suppressed because defendant was
clearly under the influence of some type of narcotic as
evidenced by his incoherent signature on the rights of
arrestee form.  The prosecutor responded that, even
though defendant may have been under the influence of a
narcotic, he was still able to clearly give his version
of the event and his personal information.  He further
responded that defendant did not ask for nor require
medical attention.  The prosecutor contended that
defendant was lucid enough to understand and
intelligently and knowingly waive his rights and give a
statement of his version of the incident.

Addison, 8 So.3d at 714-15 (footnote added).

As reflected above, no evidence was presented reflecting any

_____

[24]/Addison seeks to cast aspersions on the credibility of
Officers Nicolini and Wine based upon differing testimony regarding
who wrote Addison's statement.  Based upon such a minor disparity,
Addison concludes that the officers plainly perjured themselves,
arguing that their testimony regarding the voluntariness of his
statement was unbelievable.  Rec. Doc. No. 1, pp. 24-25.
The credibility of witnesses is within the province of the
factfinder.  United States v. Calles, 271 Fed. Appx. 931, 938 (11th
Cir.), cert. denied, 555 U.S. 899 (2008).  A difference in
testimony on a minor point, such as who actually wrote the
statement, can hardly be extrapolated to support a claim that the
officers offered perjured testimony regarding the voluntariness of
the statement.

coercion or overreaching on the part of the arresting officers. Absent such evidence, Addison's intoxication is insufficient to render his statement involuntary. The state courts' rejection of the instant claim does not represent an unreasonable application of federal law to the facts of this case.

VII. <u>IMPARTIAL JURY</u>

Addison claims that he was denied an impartial jury in violation of his right to due process. The basis of Addison's claim is his assertion that on two separate occasions while being led to and from the courtroom, jurors saw him in handcuffs and, one time, in shackles. Addison claims that the trial judge erred, showing her bias against him, by not allowing him to question jurors regarding these sightings.

Inadvertent exposure to jurors of defendants in handcuffs or other prison garb while going to and from the courtroom does not constitute a per se due process violation. Instead, a defendant has the burden of proving he was prejudiced by such exposure. <u>See United States v. Carr</u>, 464 Fed. Appx. 420, 423 (5th Cir.), <u>cert</u>. <u>denied</u>, 133 S.Ct. 229 (2012) (because defendant has not affirmatively shown prejudice arising from jurors witnessing him outside the courtroom in jail clothing and handcuffs, he is unable to establish a violation of his substantial rights); <u>United States v. Turner</u>, 674 F.3d 420, 435 (5th Cir.), <u>cert</u>. <u>denied</u>, 133 S.Ct. 302

20

(2012) (defendants bear burden of affirmatively demonstrating prejudice due to brief and inadvertent encounters with jurors while wearing handcuffs); <u>United States v. Leon</u>, 426 Fed. Appx. 251, 252 (5th Cir. 2011) (no due process violation based upon juror's inadvertent sighting of defendant in custody absent showing of actual prejudice).  Addison has made no showing as to how he was prejudiced based upon the alleged encounters with jurors while in handcuffs and, on one occasion, in shackles.

Addison also complains that the trial court erred in not allowing him to interrogate jurors in an effort to show prejudice. It is well established that trial courts have "wide discretion to control the flow of trial." <u>Thompson v. Quarterman</u>, 292 Fed. Appx. 277, 289 (5th Cir. 2008); <u>Grooms v. Wainwright</u>, 610 F.2d 344, 347 (5th Cir. 1980) (judge's decision whether to interrogate jurors is within his or her sound discretion).  In this case, the court's decision not to allow such questioning was based upon her own observation that no juror saw Addison in handcuffs.

MR. WILLIAMS [Defense Counsel]:
    Your honor, I spoke to my client.  He says that the first [juror] in probably saw him with handcuffs on, because he came in and he saw him being uncuffed by the deputy.
THE COURT:
    I was watching and I could see and they weren't looking in that direction.
MR. WILLIAMS:
    All right.  I just wanted to state it, Your Honor.
THE COURT:

21

I was looking.  They weren't.[25]

Counsel did not bring the alleged second incident to the trial court's attention until shortly before sentencing, in a motion for new trial.  Counsel charged that a single juror saw Addison handcuffed while being escorted from the courtroom.  Counsel offered no explanation as to how Addison was prejudiced by this alleged incident.  Counsel merely stated that the incident had occurred and that Addison was "unduly prejudiced . . . as a result."[26]

The trial court's denial of the motion for new trial, based upon such a barebones allegation of prejudice, was not unreasonable, especially given her broad discretion.  A trial court's ruling will generally not be disturbed on habeas review absent a showing that the ruling resulted in a due process violation.[27]  Addison has made no such showing.  The state courts' denial of Addison's claim does not represent an unreasonable application of federal law to the facts of this case.

VII.  GRUESOME PHOTOGRAPHS

Addison argues that the trial court erred in admitting photographs displaying the victim's wounds.  Addison asserts that

---

[25]/St. Rec. Vol. 3 of 7, pp. 133-34.

[26]/Rec. Doc. No. 1, p. 157.

[27]/See discussion infra at pp. 23-24.

admission of the photographs was unduly prejudicial and merely cumulative in light of the fact that the victim, a neighbor, and the emergency room doctor all testified with regard to the victim's serious injuries.

A federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law." Wilkerson v. Whitley, 16 F.3d 64, 67 (5th Cir.1994) (quotation omitted); see also Swarthout v. Cooke, 131 S.Ct. 859, 861 (2011) (federal habeas review does not lie for errors of state law); accord Molo v. Johnson, 207 F.3d 773, 776 n. 9 (5th Cir.2000); Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir.1998) (citing Estelle, 502 at 67–68; Lewis v. Jeffers, 497 U.S. 764, 780 (1990); West v. Johnson, 92 F.3d 1385, 1404 (5th Cir.1996)); see also Hoque v. Johnson, 131 F.3d 466, 506 (5th Cir.1997) (a disagreement as to state law is not cognizable on federal habeas review). Habeas corpus review is limited to questions of constitutional dimension, and federal courts generally do not review the admissibility of evidence under state law. Estelle v. McGuire, 502 U.S. 62, 67–68 (1991); Gonzales v. Thaler, 643 F.3d 425, 429 (5th Cir.2011); Jernigan v. Collins, 980 F.2d 292, 298 (5th Cir.1992).

Thus, the states are free to implement procedures regarding the admission and/or exclusion of evidence, provided those procedures do not infringe on a constitutional guarantee. Burgett v. Texas,

389 U.S. 109, 113-14 (1967); <u>Williams v. Price</u>, 343 F.3d 223, 230 n. 3 (3d Cir.2003); <u>Pemberton v. Collins</u>, 991 F.2d 1218, 1223 (5th Cir.1993); <u>Nees v. Culbertson</u>, 406 F.2d 621, 625 (5th Cir.1969). Addison's claim that the trial court errred in admitting the victim's photographs may support federal habeas corpus relief only if the state court ruling violated due process in such a way as to render Addison's criminal proceedings fundamentally unfair. <u>Lisenba v. California</u>, 314 U.S. 219, 236-37 (1941); <u>Gonzales v. Thaler</u>, 643 F.3d 425, 430 (5th Cir.2011); <u>see</u> <u>Peters v. Whitley</u>, 942 F.2d 937, 940 (5th Cir.1991) (habeas corpus review is proper only to determine whether a state trial judge's error is so extreme as "to render the trial fundamentally unfair or violate an explicit constitutional right"). Federal habeas corpus relief may be granted on erroneous state evidentiary rulings only if the evidence at issue is "a crucial, critical, or highly significant factor in the context of the entire trial." <u>Thomas v. Lynaugh</u>, 812 F.2d 225, 230 (5th Cir.1987) (citations omitted); <u>accord</u> <u>Gonzales</u>, 643 F.3d at 430; <u>Wood v. Quarterman</u>, 503 F.3d 408, 414 (5th Cir.2007).

The photographs at issue cannot be classified as "crucial, critical, or highly significant" given, as the Louisiana Fifth Circuit noted, that they merely corroborated the testimony of the victim and the emergency room doctor and a witness to the wounds suffered by the victim.  Given the significant evidence against

24

Addison, in particular, the victim's testimony as to the injuries she suffered and that Addison inflicted those injuries,[28] the Court finds that the admission of the photographs depicting the victim's injuries did not render Addison's trial fundamentally unfair.

VIII.   <u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>

Addison argues that counsel was ineffective for failing to present a handwriting expert to corroborate his assertion that he did not sign any document waiving his <u>Miranda</u> rights.[29]   Addison also argues that counsel was ineffective in failing to object to the introduction of photographs depicting the motel room spattered in blood.

The standard for judging performance of counsel was established by the United States Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), in which the Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel, requiring petitioner to prove both deficient performance and resulting prejudice.   <u>Strickland</u>, 466 U.S. at 697.   The Supreme Court first held that "the defendant must show that counsel's

---

[28]/St. Rec. Vol. 4 of 7, pp. 258-291.

[29]/It was established at trial that Addison, in fact, did not sign a waiver of rights form.  Instead, he signed "the rights of arrestee form indicating that he had read his rights and that his rights had been read to him by the officer."  <u>Addison</u>, 8 So.3d at 720.

representation fell below an objective standard of reasonableness."
Id. at 687-88. Second, "[t]he defendant must show that there is a
reasonable probability that, but for counsel's unprofessional
errors, the result of the proceeding would have been different."
Id. at 694; United States v. Kimler, 167 F.3d 889, 893 (5th
Cir.1999).

In deciding ineffective assistance of counsel claims, this
court need not address both prongs of the conjunctive Strickland
standard, but may dispose of such a claim based solely on a
petitioner's failure to meet either prong of the test. Kimler, 167
F.3d at 893. A habeas corpus petitioner "need not show that
'counsel's deficient conduct more likely than not altered the
outcome in the case.' It is not enough under Strickland, however,
'that the errors had some conceivable effect on the outcome of the
proceeding.'" Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir.1994)
(quoting Strickland, 466 U.S. at 693).

The United States Supreme Court has recently clarified that,
under Strickland, "[t]he question is whether an attorney's
representation amounted to incompetence under prevailing
professional norms, not whether it deviated from best practices or
most common custom." Harrington v. Richter, 131 S.Ct. 770, 788
(2011). The Harrington court recognized the high level of deference
owed to a state court's findings under Strickland in light of the

26

AEDPA:

> The standards created by Strickland and §2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under §2254(d). When §2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland's</u> deferential standard.

"A court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight."  <u>Bell v. Cone</u>, 535 U.S. 685, 697 (2002) (citing <u>Strickland</u>, 466 U.S. at 689).  This court must apply the "strong presumption" to counsel's strategy and tactical decisions which fall "within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 690.  A "'conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'"  <u>Johnson v. Dretke</u>, 394 F.3d 332, 337 (5th Cir.2004) (quoting <u>United States v. Jones</u>, 287 F.3d 325, 331 (5th Cir.2002)); <u>see also</u> <u>Jones</u>, 287 F.3d at 331 ("Informed strategic decisions of counsel are given a heavy measure of deference and should not be

second guessed." (quotation omitted)); <u>Geiger v. Cain</u>, 540 F.3d 303, 309 (5th Cir.2008) (same).  Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise. <u>Strickland</u>, 466 U.S. at 689; <u>Moore</u>, 194 F.3d at 591.

A.  <u>HANDWRITING EXPERT</u>

Addison complains that counsel was ineffective in failing to call a handwriting expert who allegedly could have shown that he did not waive his rights and that his statement was not voluntary.  In support of his argument, Addison points to the fact that neither the trial court nor the State's handwriting expert could discern whether it was his signature on the statement provided to officials.[30]

"'Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.'"  <u>Graves v. Cockrell</u>, 351 F.3d 143, 156 (5th Cir.2003) (quoting <u>Buckelew v. United States</u>, 575 F.2d 515, 521 (5th Cir.1978)).  This is especially true in the instant case.

Addison offers no evidence that a handwriting expert would, in fact, have corroborated his testimony that he did not sign his statement or his "rights of arrestee form."  Addison's testimony in this regard was contradicted by Deputy Michael Nicolini who

_____

[30]/Rec. Doc. No. 1, p. 80 and pp. 91-92.

"testified that he witnessed defendant sign the rights of arrestee form indicating that he had read his rights and that his rights had been read to him by the officer." <u>Addison</u>, 8 So.3d at 720.

The jury heard Addison's testimony "that he did not sign the rights of arrestee form and that the signature on that document was not his." <u>Id</u>.  The jury also heard Officer Nicolini's testimony to the contrary.  There is nothing to suggest that a handwriting expert would have endorsed Addison's testimony rather than Officer Nicolini's testimony.  The Court finds that Addison has failed to show that he was prejudiced by counsel's alleged decision not to call a handwriting expert as a witness.  Addison is not entitled to relief on this claim.

B.  <u>PHOTOGRAPHS OF MOTEL ROOM</u>

Addison claims that counsel was ineffective in failing to object to the introduction of photographs depicting the "hotel room splattered in blood."[31]  Addison, however, suggests no basis to support such an objection.  As the Louisiana Fifth Circuit observed, trial counsel cannot be ineffective for failing to object to evidence when there is no legal basis to support an objection. <u>Addison</u>, 8 So.3d at 720.  The state appellate court further explained the relevancy of the photographs.

_____

[31]/Rec. Doc. No. 1, p. 36.

> The photographs of the motel room were relevant to prove that defendant had the specific intent to kill the victim or to inflict great bodily harm upon her, since he was charged with attempted second degree murder.  They were also relevant to impeach defendant's statement to the police, wherein he claimed that the victim had the knife in her hand, and not him, and that the victim did not sustain most of her injuries in the motel room.

Id.  Indeed, defense counsel actually used the photographs to his advantage, introducing "a photograph of defendant standing in front of the motel room that showed no blood on the ground to imply that [the victim] was not severely injured when she left that room." Id. at 721.

Federal courts have consistently recognized that trial counsel's tactical decisions when supported by the circumstances are objectively reasonable and do not amount to unconstitutionally deficient performance. Lamb v. Johnson, 179 F.3d 352, 358 (5th Cir.1999), cert. denied, 528 U.S. 1013 (1999) (citing Rector v. Johnson, 120 F.3d 551, 564 (5th Cir.1997) and Mann v. Scott, 41 F.3d 968, 983-84 (5th Cir.1994)).  Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise. Strickland, 466 U.S. at 689; Moore v. Johnson, 194 F.3d at 591.  The burden is on petitioner to demonstrate that counsel's strategy was constitutionally deficient. Id.

Addison has failed to satisfy his burden of proof.  The fact that counsel's strategy proved unsuccessful does not render his

trial performance ineffective in the Sixth Amendment sense.  See
Baker v. United States, 2011 WL 3841690, *13 (E.D. Va. 2011)
("record shows . . . counsel effectively advocated on petitioner's
behalf . . . [t]hus, counsel's actions were effective
notwithstanding their lack of success").  Counsel cannot be deemed
ineffective for failing to lodge a meritless objection.  Clark v.
Collins, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise
meritless objections is not ineffective lawyering; it is the very
opposite."); see also United States v. Kimler, 167 F.3d 889, 893
(5th Cir. 1999) ("An attorney's failure to raise a meritless
argument . . . cannot form the basis of a successful ineffective
assistance of counsel claim because the result of the proceeding
would not have been different had the attorney raised the issue.").

IX.  SENTENCING

     Addison complains that the trial court, in sentencing him,
failed to go through the mitigating and aggravating factors
enumerated in La.C.Cr.P. art. 894.1(A) and (B).  Under Article
894.1(C), a trial court is to "state for the record the
considerations taken into account and the factual basis therefor in
imposing sentence."  A review of the trial court's original
sentencing and multiple bill sentencing reflects that the trial
court did not set forth the factors which were considered in

imposing Addison's sentences.[32]

A state trial court's compliance with Louisiana's sentencing laws, specifically La. Code Crim. P. art. 894.1, is not the concern of federal habeas review. <u>Butler v. Cain</u>, 327 Fed. Appx. 455, 457 (5th Cir.2009). Instead, federal courts accord broad discretion to a state trial court's sentencing decision that falls within statutory limits. <u>Haynes v. Butler</u>, 825 F.2d 921, 923-24 (5th Cir.1987); <u>Turner v. Cain</u>, 199 F.3d 437 (5th Cir. 1999) (unpublished) (sentence was within Louisiana statutory limits and within trial court's discretion, therefore petitioner failed to state cognizable habeas claim for excessive sentence).

If a sentence is within the statutory limits, a federal habeas court will not upset the terms of the sentence unless it is grossly disproportionate to the gravity of the offense. <u>Harmelin v. Michigan</u>, 501 U.S. 957 (1991); <u>Solem v. Helm</u>, 463 U.S. 277 (1983). If the sentence is not "grossly disproportionate," however, in the first instance, the inquiry is finished. <u>United States v. Gonzales</u>, 121 F.3d 928 (5th Cir.1997), <u>cert</u>. <u>denied</u>, 522 U.S. 1063 (1998). As the Supreme Court has noted, outside the context of capital punishment, successful proportionality challenges are "exceedingly rare", and constitutional violations are sustained in only "extreme"

---

[32]/<u>See</u> St. Rec. Vol. 4 of 7, p. 466 (original sentencing); St. Rec. Vol. 5 of 7, p. 14 (multiple bill sentencing).

or "extraordinary" cases. <u>Lockyer v. Andrade</u>, 538 U.S. 63 (2003).

As the Louisiana Fifth Circuit observed, Addison "was found to be a second felony offender and faced a sentencing range of 10 to 40 years at hard labor without the benefit of probation or suspension of sentence. LSA-R.S. 14:27; 14:31; 15:529.1(A)(1)(a). [Addison] received the maximum 40-year prison term." <u>Addison</u>, 10 So.3d at 238.

Addison has not shown that his sentence was grossly disproportionate or unconstitutionally excessive in light of the crime for which he was convicted. It appears that the sentence was entirely appropriate given the savagery of the attack and the life-threatening nature of the injuries Addison inflicted. The state courts' denial of relief on this issue was not contrary to established Supreme Court case law, nor was it an unreasonable application of Supreme Court precedent. Addison is not entitled to relief on this claim.

## RECOMMENDATION

For the foregoing reasons, it is hereby recommended that the application for federal habeas corpus relief filed by petitioner, Lloyd W. Addison, should be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 14 days after being served with a

33

copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. §636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996)(en banc).[33]

New Orleans, Louisiana, this _18th_ day of _____July_____, 2013.


_____
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

_____

[33]/Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.